The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. As the appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives, the Full Commission affirms the Opinion and Award of the Deputy Commissioner as follows:
 *************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the plaintiff and the defendant-employer.
3. The defendant-employer was self-insured with Key Risk Management Services serving as the servicing agent.
4. Plaintiff's average weekly wage was $269.64, which yields a compensation rate of $179.77 per week.
5. A Form 21 Agreement was entered into on 20 April 1994, and approved by the Industrial Commission on 23 May 1994.
6. The parties have further stipulated into evidence an indexed packet of records consisting of Industrial Commission Forms, list of carrier payments, medical records, and discovery responses, consisting of 268 pages.
 *************
The Full Commission affirms the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was a 30 year old high school graduate. Beginning on 6 January 1994, he was employed by defendant-employer as a brick mason helper.
2. On 11 March 1994, while acting in the course of his employment, plaintiff dropped a block of cement on his left foot, injuring his left great toe.
3. Plaintiff first sought treatment on 15 March 1994, with Onslow Doctor's Care. Plaintiff was given a tetanus shot and Keflex.
4. On 4 April 1994, plaintiff presented to Dr. E. G. Gallagher at the Onslow Memorial Hospital. Dr. Gallagher treated plaintiff for cellulitis on the dorsum of the left foot great toe. Dr. Gallagher noted a thick eschar on the tip of the left great toe. Plaintiff was instructed to quit smoking, was given an injection of Rocephin IM.
5. Dr. Gallagher continued to treat plaintiff on a daily basis. On 8 April 1994, plaintiff did not show any improvement and was admitted to the hospital for IV antibiotics and whirlpool treatments. Dr. Gallagher continued with a diagnosis of cellulitis with necrotic tissue in the region of the left great toe.
6. On 14 April 1994, Dr. Gallagher consulted with Dr. Noel B. Rogers, who recommended continuing the whirlpool treatments. On 16 April 1994, Dr. Rogers advised plaintiff that it would be necessary to conduct a partial amputation of the great toe, back to a healthy base.
7. On 20 April 1994, a Form 21 Agreement was entered into between the parties accepting plaintiff's claim and paying him compensation at the rate of $179.77 for necessary weeks beginning 4 April 1994. The Form 21 was subsequently approved by the Commission on 24 May 1994.
8. According to the records of Pitt County Memorial Hospital, plaintiff had been a smoker for the last fifteen (15) years.
9. Plaintiff continued to treat with Dr. Rogers. By 26 May 1994, the cellulitis began involving the second toe. Dr. Rogers referred plaintiff to Dr. Luke J. Curtsinger, East Carolina University School of Medicine. On 3 June 1994, plaintiff was admitted to Pitt County Memorial Hospital. Dr. Curtsinger found that the entire distal phalanx of both toes required resection, and the operation was performed on 3 June 1994, with a skin graft to the medial aspect of the third toe. Plaintiff remained hospitalized through 1 July 1994, as Dr. Curtsinger felt plaintiff would not be able to "take good care of it at home." Plaintiff continued to show signs of necrotic tissue and cellulitis.
10. On 12 June 1994, plaintiff underwent debridement of the left great and second toes. Plaintiff continued to smoke despite Dr. Curtsinger's instructions to stop, and 80% of the skin graft to his third toe was lost. Dr. Curtsinger continued to try to control the area and additional surgery was performed on 16 June 1994.
11. On 23 June 1994, plaintiff underwent an incision at the level of the first metatarsal neck which was transacted. The bone and flexor tendons were trimmed. The volar plate was excised and a catheter was inserted in the left subclavian vein. On 25 June 1994, plaintiff underwent further debridement of the toes. On 1 July 1994, plaintiff was discharged to his home with Home Health continuing to care for his wound.
12. By September 1994, plaintiff had quit smoking and his wounds were healing. He was advised to return for follow-up exams in October 1994.
13. On 4 October 1994, Dr. Curtsinger prescribed a left custom insert steel toe work boot. By 12 October 1994, plaintiff's toes were well healed, and he was released to follow-up in six months. Plaintiff was instructed to return immediately if any sores or ulcers appeared.
14. On 1 November 1994, Dr. Curtsinger approved plaintiff's job description and released him to return to work as of 3 November 1994. On that date, plaintiff returned to work at the same or greater wages he earned prior to his injury.
15. Although plaintiff stated that he developed sores on his feet which were present for four or five days a week, they were not significant as he did not seek medical attention despite having been made aware of the necessity of doing so given the history of his condition.
16. On 12 April 1995, plaintiff returned for his six month follow-up. Dr. Curtsinger noted plaintiff was working full time and doing everything he wanted. There was no mention of any sores or of problems with plaintiff's boot rubbing.
17. On 1 September 1995, plaintiff was found to be at maximum medical improvement and rated at a sixteen (16%) percent permanent partial impairment to the foot. A Form 26 and Form 28 were dated and forwarded to plaintiff on 8 September 1995.
18. Plaintiff was seen by plastic surgeon Dr. William Wooden on 1 September 1995. Dr. Wooden found plaintiff's wounds well healed. Dr. Wooden noted an area on top of the foot which was tender and irritated; however, Dr. Wooden found the amputated wounds well healed.
19. Plaintiff was seen for follow-up with Dr. Wooden on 18 December 1995. Dr. Wooden noted a black eschar on the top of plaintiff's left foot which plaintiff reported as beginning as a pimple approximately ten days earlier. Dr. Wooden began conservative treatment and recommended plaintiff return in ten days.
20. On 5 January 1996, plaintiff stopped working for defendant-employer.
21. Plaintiff returned to Dr. Wooden on 10 January 1996, with further inflammation on the top of his foot. Plaintiff was admitted to Pitt County Memorial Hospital. By 10 January 1996, plaintiff was again smoking as documented in the admission note. Plaintiff's original amputation continued to be well healed with the new problem located in the middle of his foot. Dr. Wooden treated the new wound as fascitis and deep ulcer of the left foot.
22. On 11 January 1996, plaintiff underwent surgical excision and debridement of necrotic tissue and subcutaneous tissue. On 15 January 1996, plaintiff was recommended to undergo either vascular reconstruction or amputation. On 16 January 1996, plaintiff underwent a femoral arteriogram. Dr. Wooden consulted with Dr. David Deaton, vascular surgeon, and they were of the opinion that plaintiff had Buergers' disease.
23. Dr. Wooden and Dr. Deaton testified that Buergers' disease is a process which affects the smaller vasculature leading to the muscles in the skin at the extremities. The lack of blood flow leads to ischemic limbs and to spontaneous development of ulcers. Buergers' disease is only found in smokers and is most commonly found in male smokers. Buergers' disease is aggravated by cold weather and smoking.
24. On 19 January 1996, plaintiff underwent a vein bypass to promote blood flow. Plaintiff continued to undergo treatment while admitted at the hospital. On 26 January 1996, plaintiff was discharged from Pitt County Memorial Hospital. Plaintiff was told that he "must not smoke."
25. On 26 January 1996, Dr. Deaton sent a letter to Dr. Rogers stating that plaintiff fit the classic picture of a young male smoker with Buergers' disease.
26. Dr. Wooden testified in his deposition that the lesion on the top of plaintiff's foot which first occurred in December 1995, and the subsequent problems was more likely than not caused by or attributable to Buergers' disease. Dr. Wooden further testified that plaintiff's ulceration was consistent with spontaneous ulcerations which occur from Buergers' disease, and that plaintiff's problems beginning 18 December 1995 which occurred contemporaneously with the cold weather and plaintiff's resumption of smoking were caused by Buergers' disease rather that any alleged boot rubbing against the top of his foot.
27. Dr. Deaton testified that for people with Buergers' disease, an ischemic condition affecting the foot, even walking is intolerable and results in trauma to the foot. He stated that the December 1995 blister on top of plaintiff's foot was not causally related to any trauma in March of 1994, and that plaintiff's problems were more likely than not caused by Buergers' disease.
28. There is no causal connection, according to the two doctors, between plaintiff's present condition and the original injury by accident.
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The person claiming the benefits of compensation has the burden of proving that the injury complained of resulted from an accident arising out of and in the course of employment. Henry v.A.C. Lawrence Leather Company, 231 N.C. 477, 57 S.E.2d 760 (1950).
2. Plaintiff failed to carry the burden of proof to establish by the greater weight of the competent medical evidence that his current condition, including Buergers' disease, was caused by his compensable injury of 11 March 1994. The greater weight of the competent medical evidence proves that plaintiff's injuries to the top of his foot as of December 1995 and continuing are caused by his idiopathic condition of Buergers' disease. N.C. Gen. Stat. § 97-2(6); N.C. Gen. Stat. § 97-47.
3. Plaintiff's claim, therefore, is not compensable under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6); N.C. Gen. Stat. § 97-47.
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 ORDER
1. Plaintiff's claim for additional compensation is hereby DENIED.
2. The parties shall divide the costs of this action. Defendants shall pay expert witness fees of $350.00 to Dr. William Wooden and $350.00 to Dr. David Deaton.
 S/ ________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER